Franklin J. Rooks, Jr., Esq.
Attorney ID: 023802010
**Morgan Rooks, P.C.**
525 Route 73 North, Suite 104
Marlton, NJ, 08053
Telephone No. (856) 874-8999
Facsimile No. (856) 494-1707
Email: fjrooks@morganrooks.com

Jared A. Jacobson, Esquire
Attorney ID: 022002005
**Jared Jacobson Law, LLC**
144 N. Narbeth Avenue, Suite 502
Narbeth, PA, 19072
Telephone No. (215) 399-0690
Facsimile No. (609) 543-2600
Email: jjacobson@jaredjacobsonlaw.com

|  | Attorneys for Relator |
|---|---|
| UNITED STATES ex. rel. : | UNITED STATES DISTRICT COURT |
| SHARON LAMPKIN : | DISTRICT OF NEW JERSEY |
| : | |
| *Relator,* : | **FILED IN CAMERA AND UNDER** |
| : | **SEAL** |
| v. : | |
| : | DOCKET NO. 1:16-CV-01817-RMB- |
| PREMIER EDUCATION GROUP, : | KMW |
| LLC, : | |
| : | CIVIL ACTION |
| PIONEER EDUCATION, LLC, : | |
| : | JURY TRIAL DEMANDED |
| PIONEER EDUCATION : | |
| MANAGER, INC., : | PROPOSED SECOND AMENDED |
| : | COMPLAINT |
| JOLIE HEALTH & BEAUTY : | |
| ACADEMY : | |
| : | |
| JOSEPH VISCONTI : | |
| : | |
| *Defendants.* : | |
| : | |

Sharon Lampkin (hereinafter, "Relator"), by and through her attorneys, hereby files

this Second Amended Complaint on behalf of herself and the United States pursuant to the

provisions of the *qui tam* provisions of the Federal False Claims Act (FCA") 31 U.S.C. §

3729 et. seq.

## INTRODUCTION

1.  This is an action to recover damages and civil penalties on behalf of the United States arising from false statements and claims that Pioneer Education, LLC, Pioneer Education Manager, Inc., and the Jolie Health and Beauty Academy, knowingly presented to, or caused to be presented to the United States, Department of Education in violation of the Federal FCA.

2.  Pioneer Education, LLC, Pioneer Education Manager, Inc., and the Jolie Health and Beauty Academy, are collectively referred to as the "Defendants."

3.  Federal student aid programs are authorized pursuant to Title IV of the Higher Education Act ("HEA") of 1965, as amended, 20 U.S.C. § 1070 et seq.

4.  The HEA programs, which are administered by the Department of Education, provide students with financial aid in the form of, among other things, Federal Pell Grants and loans guaranteed by the Federal Government.

5.  Defendants executed program participation agreements ("PPAs") with the Department of Education for Title IV funding.

6.  Each PPA that Defendants signed certified that they understood and agreed that they were subject to and would comply with the program statutes and implementing regulations for institutional eligibility as set forth in 34 C.F.R. Part 600 and for each Title IV HEA Program in which it participated, as well as the general provisions set forth in Part F and Part G of Title IV of the HEA, and the Student Assistance General Provisions regulations set forth in 34 C.F.R. Part 668.

7.  By signing each PPA, Defendants agreed to meet all state licensure and accreditation requirements, including all requirements established pursuant to Part H of Title IV of

the HEA by the Secretary of Education, state authorizing bodies, and nationally recognized accrediting agencies.

8. Defendants knowingly presented and/or has made, or caused to be presented or made, false claims and statements in the course of its participation with Title IV programs.

9. Defendants made representations in the PPAs it executed with the Department of Education but omitted their violations of statutory and regulatory requirements contained in each PPA.

10. Defendants failed to disclose its violations of regulations governing satisfactory progress, which occurred through the falsification of students' grades.

11. Defendants failed to disclose its violations of regulations governing students' attendance.

12. Defendants failed to disclose its violations of regulations which pertained to permitting ineligible students to enroll at the Jolie Health and Beauty Academy and remain enrolled.

13. Defendants made false statements and concealed material information from state licensing agencies and the Department of Education in order to ensure that it would maintain its state license, maintain its accreditation, and continue to receive Federal funding under Title IV programs.

14. Defendants' fraudulent scheme allowed them to secure more Title IV funding for certain students than those students were otherwise eligible to receive.

15. Defendants' conduct was knowing and material to their continued eligibility to receive funds from the Department of Education via the Title IV HEA programs.

16.   Beginning at least as early as 2012, Defendants knowingly submitted, or caused to be submitted, numerous false claims for payment to the Department of Education arising from Defendants' fraudulent course of conduct.

17.   Defendants' intentional and knowing omissions of the violations that they committed when executing PPAs with the Department of Education caused the Federal government to issue Title IV funds to Defendants that the government otherwise would not have remitted.

18.   But for Defendants' false certification of material information contained in each PPA, the Federal Government would not have issued Title IV funding.

## JURISDICTION AND VENUE

19.   This Court has jurisdiction over Defendants' violations of Federal FCA, pursuant to 31 U.S.C. § 3732(b).

20.   This Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 et. seq. occurred in this District.

21.   Venue is proper under 28 U.S.C. §1391(b), (c), and 31 U.S.C. § 3732(a) because Defendants transact business within the District of New Jersey and the facts forming the basis of this First Amended Complaint occurred within this District.

22.   Relator is the original source of the information upon which this Second Amended Complaint is based, pursuant to 31 U.S.C. § 3730.

## THE PARTIES

23.   Relator is a citizen of the United States and residing in the State of New Jersey.

24.   Defendant Pioneer Education LLC is a foreign limited liability company registered with the New Jersey Department of Corporations with entity ID of 0600368143.

25.     Defendant Pioneer Education LLC is domiciled in the State of Delaware, registered under file number 4186245**.**

26.     Upon information and belief, Pioneer Education LLC and Pioneer Education Manager, Inc., are headquartered at 25 Wilkes-Barre Blvd, Wilkes-Barre, PA 18702.

27.     Pioneer Education Manager, Inc., is a for-profit corporation that is domiciled in the State of Delaware under entity identification number 4183700.

28.     Defendant Jolie Health and Beauty Academy is located at 801 Tilton Road Northfield, New Jersey 08225.

29.     Upon information and belief, Pioneer Education Manager, Inc., and Defendant Pioneer LLC, own, operate, and control Defendant Jolie Health and Beauty Academy.

## **GENERAL FACTS**

30.     Defendant Jolie Health and Beauty Academy is a post-secondary educational institution offering career training in a variety of occupations, such as cosmetology, skin care, and barbering.

31.     The Jolie Health and Beauty Academy operates in Cherry Hill, New Jersey, Northfield, New Jersey, Turnersville, New Jersey, Wilkes Barre, Pennsylvania, and Ludlow, Massachusetts.[1]

32.     Relator began employment on a full-time basis with Defendant Jolie Health and Beauty Academy on or about October 29, 2012; she was paid at an hourly rate of $20.00.

33.     At Defendant Jolie Health and Beauty Academy, Relator was employed as a Lead Barber Instructor their barbering program.

---

[1] https://www.jolieacademy.com/

34.     Defendant Jolie Health and Beauty Academy is accredited by the National Accrediting Commission of Career Arts and Sciences ("NACCAS").[2]

35.     NACCAS is recognized by the U.S. Department of Education as a national agency for the institutional accreditation of postsecondary schools and departments of cosmetology arts and sciences, including specialized schools.[3]

36.     The NACCAS accreditation policy requires that "[t]he institution complies with applicable federal (including Title IV Federal Financial Aid), state, and local statutes and regulations governing the operations of the institution including the NACCAS Rules of Practice and Procedure."[4]

37.     Defendant Jolie Health and Beauty Academy has an Integrated Post-Secondary Education Data System (IPEDS) number of 478661.[5]

38.     Defendants received Title IV funds, established by certain federal student loan programs, including but not limited to, Stafford loans, which are used for payment of students' tuition. Acceptance of federal funds is referenced on Defendant Jolie Health and Beauty Academy's website.[6]

39.     Relator was required to understand and be familiar with specific provisions of the Defendant Jolie Health and Beauty Academy's Student Handbook.

---

[2] http://naccas.org/naccas/accredited-school-search
[3] http://naccas.org/naccas/what-is-naccas
[4] http://elibrary.naccas.org/InfoRouter/docs/Public/NACCAS%20Handbook/Standards%20and%20Criteria/Complete%20Set%20of%20Standards%20I-X.pdf
[5] https://nces.ed.gov/globallocator/index.asp?search=1&State=NJ&city=&zipcode=&miles=&itemname=Jolie&sortby=state&School=1&PrivSchool=1&College=1&Status=Search+Finished&Records=16&CS=43C3FDF5. See also https://nces.ed.gov/about/. The National Center for Education Statistics (NCES) is the primary federal entity for collecting and analyzing data related to education in the U.S. and other nations. NCES is located within the U.S. Department of Education and the Institute of Education Sciences. NCES fulfills a Congressional mandate to collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally
[6] See http://www.jolieacademy.com/financialaid/

40. Defendant Jolie Health and Beauty Academy's Student Handbook sets forth attendance standards and for its students as well as the requirements for its students' satisfactory academic progress. (Please see attached **Exhibit A**).

41. Defendants' written attendance standards are based on New Jersey regulations promulgated by the New Jersey State Board of Cosmetology and Hairstyling.

42. Defendant Jolie Health and Beauty Academy's Attendance Policy stated, "*Attendance is taken at the beginning of every class meeting…If a student arrives more than 10 minutes late to class and does not communicate with the instructor, they are subject to be sent home for the day.*" (Please see attached **Exhibit A**).

43. Defendant Jolie Health and Beauty Academy's Attendance Policy further stated, "*Absences of 14 consecutive days will require a student to be terminated.*" (Please see attached **Exhibit A**).

44. Defendant Jolie Health and Beauty Academy's Student Handbook also sets forth student conduct suspension/dismissal policies for its students. (Please see attached **Exhibit B**).

45. Defendant Jolie Health and Beauty Academy failed to keep and maintain accurate student attendance records, as required by New Jersey State Board of Cosmetology and Hairstyling and Title IV regulation 34 C.F.R. § 668.22(b)(3)(i)(A).

46. Relator became aware of specific instances in which academically ineligible students were permitted to maintain their enrollment at Defendant Jolie Health and Beauty Academy. Relator believed that Defendants maintained these academically ineligible students enrolled to prevent Defendants' loss of Title IV funds used to finance the students' education.

47.     Relator has personal knowledge of classes being offered at Defendant Jolie Health and Beauty Academy in which the student-to-teacher ratios were as much as 48 students per one teacher, well in excess of the statutory requirement of no more than 30 students per one teacher.

48.     Relator has personal knowledge of non-English speaking students being enrolled in classes at Defendant Jolie Health and Beauty Academy which, by New Jersey law, were ineligible because no determination was made regarding their placement.

49.     Relator has personal knowledge of the enrollment of students at Defendant Jolie Health and Beauty Academy who had moderate to severe learning disabilities who were not qualified candidates because they could not perform the essential functions of a barber with or without a reasonable accommodation.

50.     Relator has personal knowledge of students at Defendant Jolie Health and Beauty Academy who failed to achieve satisfactory academic progress for their required coursework. Defendants fraudulently gave those students passing grades for the sole purpose Defendants' continued receipt of Title IV funds from the Federal Government.

51.     Relator has personal knowledge of forged sign-in attendance records for students at Defendant Jolie Health and Beauty Academy.

52.     Over the course of her last three months of employment at Defendant Jolie Health and Beauty Academy, Relator communicated with members of the Defendants management team – Kelly Herbst, Kristen Maguire, Corey Matthews, Sandy Mazella, and Jim O'Brien - on numerous occasions about students' lack of satisfactory academic progress, student conduct code infractions, and attendance violations.

53.  Relator informed Defendants' management team that Defendants were not in compliance with the attendance requirements set by New Jersey State law for the barbering program.

54.  Specifically, Relator showed Ms. McGuire a copy of the regulations for the New Jersey Board of Cosmetology and Hairstyling and informed Ms. McGuire that Defendants were in violation of those regulations.

55.  Relator complained to Ms. McGuire that the Beauty Academy was operating illegally by failing to enforce attendance.

56.  Ms. Herbst was aware of the attendance problems at Defendant Jolie Health and Beauty Academy.  On May 23, 2014, Ms. Herbst sent an email to Relator, with the subject "Barber attendance:"

   *As requested Corey and I will be speaking to your class sometime next week about the attendance and having the goal of completing by June 30th.  Lynette, the DOE, will be coming in tues or Wednesday and I am scheduled to meet with her and Corey regarding it. Hopefully, it will help with the attendance.*  (Please see attached **Exhibit C**)

57.  On May 27, 2014, Ms. Herbst sent another email to Relator, with the same subject "Barber attendance:"

   *Shay- You know these are also very in line with my true feelings.  Unfortunately, I too, have grown tired of fighting what seems to be the never ending battle.  I was truly hoping to be able to make a difference.  My resolve is waning.  I am getting to the exhausted point as well.  Maybe we can come up with a better solution or solutions.* (Please see attached **Exhibit D**)

58.  Relator brought her complaints to Kelly Herbst, Lead Supervisor of Staff at Defendant Jolie Health and Beauty Academy, beginning on or about November 2012. At monthly staff meetings, Relator expressed her concerns to management about Defendants' failure to enforce legally mandated attendance requirements.

59.   Relator was an exemplary teacher; she was named Employee of the Month at Jolie Beauty Academy for July 2015.

60.   Laura Rebovich, the registrar at Defendant Jolie Health and Beauty Academy, told Relator that she was asked to change students' grades.

61.   Upon information and belief, Ms. Rebovich was terminated for refusing to alter documents.

62.   Jason Liverman was Relator's immediate supervisor.

63.   Relator complained to Mr. Liverman about Defendants' enrollment of ineligible students.

64.   Relator complained to Mr. Liverman about Defendants' failure to enforce legally mandated attendance requirements.

65.   Relator complained to Mr. Liverman about the illegality of Defendants' enrollment practices.

66.   Mr. Liverman relayed Relator's complaints to Defendants' management team.

67.   On October 1, 2015, Defendants terminated Relator's employment, as a direct result of and in retaliation for Relator complaining about Defendants' failure to enforce legally mandated attendance requirements, enrolling ineligible students, and maintaining ineligible students enrolled.

68.   After her termination, Relator contacted her former supervisor at Defendant Jolie Health and Beauty Academy, Jason Liverman, for a letter of reference to aid her in finding replacement employment.

69.   Corey Matthews, a Director at Defendant Jolie Health and Beauty Academy, provided Relator with a reference letter. (Please see attached **Exhibit E**)

70.   Mr. Liverman provided Relator with a reference letter, which stated, in pertinent part:

> *Jolie's enrollment strategies were to enroll anyone who could afford to be there, character, learning abilities, criminal records, and overall character were not taken into consideration. Some of Shay's students included a blind man (literally), an accused sexual predator, multiple (alleged) drug dealers, and other characters who do not make up an ideal classroom setting. Jolie also made Shay's job difficult because they were unable (or perhaps unwilling) to hire a second full time barbering teacher to take over the new class that came in, leaving Junior and Senior students together. This is not only illegal in terms of the state's rules, but does not make for a productive learning environment….Students with behavioral problems were routinely pushed through the system because we were collecting money from them.* (Please see attached **Exhibit F**)

71.   The U.S. Department of Education releases official cohort default rates once per year. The fiscal year 2016 official cohort default rates were delivered to both domestic and foreign schools on September 23, 2019.[7]

72.   The cohort default rate is determined taking  (a) the number of students who entered repayment on their loans in the specified fiscal year and defaulted within the same fiscal year or the subsequent fiscal year and (b) dividing that number by the number of students who entered repayment on their loans in the specified fiscal year.[8]

73.   The Secretary for the Department of Education announced that the fiscal year 2016 national cohort default rate is 10.1%.[9]

74.   The national cohort default rate for fiscal year 2015 was 10.8%.[10]

75.   The Department of Education assigns an Office of Postsecondary Education number to identify schools which have PPAs. This number is termed the "OPE-ID.[11]

76.   The first 6-digits of the OPE ID number relate to the education institution and are followed by a 2-digit suffix used to identify branches.

---

[7] https://www2.ed.gov/offices/OSFAP/defaultmanagement/cdr.html
[8] https://ifap.ed.gov/sites/default/files/attachments/2019-06/CDRGuideCh2Pt1CDRCalculation.pdf
[9] https://www2.ed.gov/offices/OSFAP/defaultmanagement/cdr.html
[10] https://www.ed.gov/news/press-releases/national-student-loan-cohort-default-rate-falls#:~:text=The%20U.S.%20Department%20of%20Education,11.5%20percent%20to%2010.8%20percent.
[11] https://www.dodmou.com/Home/EnterOpeidBeforeCreateUserAccount

77.     Defendant Jolie Health and Beauty Academy has an OPE-ID of 02178901 for its Northfield, New Jersey location.[12]

78.     Defendant Jolie Health and Beauty Academy's default rate for 2016 was 33.9%, in excess of the national default rate.[13]

79.     Defendant Jolie Health and Beauty Academy's default rate for 2015 was 18.5%, in excess of the national default rate.[14]

80.     The cohort default rate for all postsecondary schools in New Jersey was 9.4% for fiscal year 2016.[15]

81.     Schools with high cohort default rates may lose their eligibility to participate in federal student aid programs. [16]

82.     All institutions with a cohort default rate that is equal to or greater than 30% must establish a default prevention task force that prepares a plan to identify the factors causing the school's CDR to exceed 30% and submit the plan to the Department.[17]

83.     For the 2016-2017 school year, Defendant Jolie Health and Beauty Academy has an overall graduation rate of 59%.[18]

## NEW JERSEY STATE STATUTORY AND REGULATORY BACKGROUND GOVERNING BARBER SCHOOLS

84.     Licensed schools shall comply with all laws and rules relating to the practice of cosmetology and hairstyling, beauty culture, barbering, manicuring, or skin care specialty including the Cosmetology and Hairstyling Act of 1984, N.J.S.A. §§ 45:5B-1

---

[12] https://ope.ed.gov/dapip/#/institution-profile/138637/138637002
[13] https://nslds.ed.gov/nslds/nslds_SA/defaultmanagement/cohortdetail_3yr.cfm?sno=0&ope_id=021789
[14] Id.
[15] https://www2.ed.gov/offices/OSFAP/defaultmanagement/staterates.pdf
[16]34 C.F.R. § 668.217; see https://www.ed.gov/news/press-releases/national-federal-student-loan-cohort-default-rate-continues-decline
[17] https://www.ed.gov/news/press-releases/national-federal-student-loan-cohort-default-rate-continues-decline
[18] https://nces.ed.gov/collegenavigator/?q=jolie&s=all&id=478661#retgrad

*et seq.*; the rules of the New Jersey State Board of Cosmetology and Hairstyling, <u>N.J.A.C.</u> § 13:28; the Uniform Enforcement Act, <u>N.J.S.A.</u> §§ 45:1-7.1, 7.2, 7.3, and 14 *et seq.*; and the Uniform Regulations of the Division of Consumer Affairs, <u>N.J.A.C.</u> § 13.45C, 13:28-6.1.

85.   "Registered student" means a person who is engaged in learning and acquiring a knowledge of any of the practices included in the definition of cosmetology and hairstyling under the direction and supervision of a person duly authorized under this act to teach cosmetology and hairstyling and who is enrolled in a program of instruction at a licensed school of cosmetology and hairstyling, completion of which may render him eligible for licensure pursuant to this act. <u>N.J.S.A.</u> § 45:5B-3(o).

86.   "School" means an establishment or place licensed by the board to be maintained for the purpose of teaching cosmetology and hairstyling to registered students. <u>N.J.S.A.</u> § 45:5B-3(q).

87.   No person, firm, corporation, partnership or other legal entity shall operate, maintain or use premises at which courses of instruction in cosmetology and hairstyling services are offered to registered students without first having secured a school license from the board. <u>N.J.S.A.</u> § 45:5B-10.

88.   It shall be unlawful for a licensed school or school owner to engage in fraudulent practices for the purpose of securing financial aid from any institution or agency offering aid to students of cosmetology or hairstyling. <u>N.J.S.A.</u> § 45:5B-14(e).

89.   It shall be unlawful for a licensed school or school owner to fail to maintain accurate records of attendance by any registered student for at least five years after the student's enrollment ends, which records shall be subject to inspection by the board. <u>N.J.S.A.</u> § 45:5B-14(i).

90.  It shall be unlawful for a licensed school or school owner to fail to notify the board on forms it may prescribe of any student who obtains a leave of absence, fails to attend classes for a period of more than 90 consecutive days or withdraws from school. N.J.S.A. § 45:5B-14(j).

91.  An applicant for licensure as a barber shall have completed a 900-hour course of instruction in barbering, consistent with the requirements of N.J.A.C. § 13:28-6.29B; N.J.A.C. 13:28-1.1(e)(1)(iii).

92.  "A licensed school shall evaluate each non-English speaking student to determine whether such student is likely to succeed in the intended course of study. Upon such determination being made, the school may enroll the non-English speaking student. The school shall submit documentation to the Board certifying that the school has evaluated a prospective non-English speaking student and has determined that the student is proficient in reading and writing the language in which the examination will be administered to that student." N.J.A.C. § 13:28-6.9(a).

93.  "Each school shall maintain a register of all students and check students' attendance twice daily." N.J.A.C. § 13:28-6.15(a).

94.  "Each school shall keep a detailed record of students' attendance at classes and subjects taught at these classes." N.J.A.C. § 13:28-6.15(b).

95.  "The number of teachers a school shall employ shall be a minimum of one licensed teacher for every clinic area attended by up to 25 senior students (whether cosmetology and hairstyling, beauty culture, barbering, manicuring, or skin care specialty students)." N.J.A.C. § 13:28-6.23 (a)(1).

96.  "Uniform time sheets of daily attendance records for each student for each course of instruction shall be forwarded to the office of the Board at the end of each month. The

time sheets shall contain the name and license number of the teacher conducting the course." <u>N.J.A.C.</u> § 13:28-6.15(d)(1).

97.    "Applicants must receive a passing grade on each part of the examination to obtain a license. An applicant shall achieve a score of not less than 75 percent on the theory portion of the examination in order to be eligible to take the practical examination. No applicant shall be permitted to take the practical examination unless the applicant has successfully completed the theory portion of the examination." <u>N.J.A.C.</u> § 13:28-1.2(b).

98.    "Failure of any student to observe school rules and regulations shall be considered sufficient justification for expulsion." <u>N.J.A.C.</u> § 13:28-6.21(h).

<b><u>FEDERAL STATUTORY BACKGROUND</u></b>

### *Title IV of the Higher Education Act of 1965*

99.    Under Title IV of the Higher Education Act of 1965, the Federal Government operates a number of programs that disburse funds to students to help defray the costs of higher education. 20 U.S.C. §§ 1070—1099d. These programs include the Federal Pell Grant, the Federal Family Educational Loan Program, the William D. Ford Federal Direct Loan Program, and the Federal Perkins Loan.

100.    The Department of Education administers the Title IV Federal Student Aid ("FSA") programs.

101.    A proprietary institution of higher education is an educational institution that provides an eligible program of training to prepare students for gainful employment in a recognized occupation. 34 C.F.R. § 600(a)(5).

102.    Proprietary institutions of higher education must be accredited. 34 C.F.R. § 600(a)(6).

103. In 2008, Congress reauthorized the HEA, as amended, through its passage of the Higher Education Opportunity Act, Pub. L. No. 110-315 ("HEOA").

104. Each of the Title IV programs requires compliance with specific requirements as a prerequisite to obtaining Federal funds. One requirement is that in order to become eligible to receive Title IV funds under these programs, each institution must enter into a PPA with the Department of Education. 20 U.S.C. § 1094(a).

105. An institution may participate in Title IV, only if it enters into a written program participation agreement with the Department of Education. 34 C.F.R. § 668.14(a)(1).

106. By entering into a PPA, an institution agrees that it will comply with all statutory provisions applicable to Title IV and all applicable regulatory provisions prescribed under that statutory authority. 34 C.F.R. § 668.14(b)(1).

107. To participate in any Title IV program, an institution must administer the Title IV program in accordance with "[a]ll statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA . .." 34 C.F.R. § 668.16(a).

108. PPAs expressly "[c]ondition the initial and continuing eligibility of the school to participate in a program upon compliance with" the requirements of 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

109. A school must be accredited and licensed to operate in each state in which it is doing business in order to be eligible to receive Title IV funding. 20 U.S.C. § 1001; 34 C.F.R. § 600.5(a)(4), (6).

110. Student eligibility requirements under the Title IV Federal Student Aid programs are set forth under 34 C.F.R. § 668.32.

111.   A student is eligible to receive Title IV, HEA program assistance if, among other requirements, maintains satisfactory progress in his or her course of study according to the institution's published standards of satisfactory academic progress…" 34 C.F.R. § 668.32(f).

112.   Federal regulations require the institution to maintain accurate attendance records of its students. 34 C.F.R. § 668.22(b)(3)(i)(A).

113.   The institution's policy must require an academic progress evaluation at the end of each payment period for students in programs lasting one year or less.[19]

114.   An institution must establish a reasonable policy for determining whether an otherwise eligible student is making satisfactory academic progress in his or her educational program and may receive assistance under the Title IV HEA programs. 34 C.F.R. § 668.34(a)

115.   Among other criteria, an educational institution's policy on satisfactory academic progress is reasonable is "[t]he policy specifies the grade point average (GPA) that a student must achieve at each evaluation, or if a GPA is not an appropriate qualitative measure, a comparable assessment measured against a norm." 34 C.F.R. § 668.34(a)(4)(i).

116.   Financial aid warning is a status assigned to students who fail to make satisfactory academic progress at an institution that evaluates academic progress at the end of each payment period. 34 C.F.R. §668.34(b).

117.   A student on financial aid probation for a payment period may not receive Title IV, HEA program funds for the subsequent payment period unless the student makes

---

[19] https://ifap.ed.gov/fsahandbook/attachments/1516FSAHbkActiveIndexMaster.pdf

satisfactory academic progress or the institution determines that the student met the requirements specified by the institution in the academic plan for the student. 34 C.F.R. §668.34(c)(4).

118.   A credit hour is an amount of work represented in intended learning outcomes and verified by evidence of student achievement that is an institutionally established equivalency that reasonably approximates not less than—(1) one hour of classroom or direct faculty instruction and a minimum of two hours of out of class student work each week for approximately fifteen weeks for one semester or trimester hour of credit, or ten to twelve weeks for one quarter hour of credit, or the equivalent amount of work over a different amount of time; or (2) at least an equivalent amount of work as required in paragraph (1) of this definition for other academic activities as established by the institution including laboratory work, internships, practica, studio work, and other academic work leading to the award of credit hours. 34 C.F.R. § 600.2.

119.   A clock-hour is period of time consisting of (1) a 50- to 60-minute class, lecture, or recitation in a 60-minute period; (2) a 50- to 60-minute faculty-supervised laboratory, shop training, or internship in a 60-minute period; or (3) 60 minutes of preparation in a correspondence course. 34 C.F.R. § 600.2.

120.   In the case of a program that is measured in clock-hours, a student is considered to be withdrawn for a Title IV payment period if the student does not complete all of the clock-hours and weeks of instructional time in the payment period or period of enrollment that the student was scheduled to complete. 34 C.F.R. § 668.22(2)(i)(B)

### *Stafford Loans and Pell Grants*

121.   For subsidized Stafford loans, the Federal Government pays the interest on the student's behalf during the time the student is enrolled in school on at least a half-time basis and

during the student's grace period before repayment commences. 34 C.F.R. § 682.102(d)(2).

122. In the event of default on the loan, the Department of Education pays to the guarantee agency all or part of the unpaid principal and accrued interest, as well as a variety of administrative costs. 34 C.F.R. § 682.404.

123. The Pell Grant program provides Federal funds to assist post secondary school students in financial need. 20 U.S.C. §§ 1070a - 1070a(6).

124. The PPA entered into between the institution and the Department of Education must specifically authorize the institution to receive Pell Grant funds from the Department of Education. 20 U.S.C. § 1094(a); 34 C.F.R. § 690(g).

125. The PPA must also specifically authorize the institution to accept student applications and to calculate and disburse Pell Grants in accordance with the rules established by the Department. 20 U.S.C. § 1094(a); 34 C.F.R. § 690(g).

126. In order to receive a Pell Grant, a student must initiate the process by submitting an application to the school which will then electronically transmit it to the Department on his or her behalf or the student can directly submit an application to the Department. 34 C.F.R. § 690.12(b).

### *Claims for Payment under Title IV Programs*

127. After an educational institution becomes eligible to receive Title IV funds by entering into a PPA, claims for payment of those funds can be made.

128. Under the Pell Grant program, students submit requests for funding directly to the Department of Education, or to the Department of Education with the assistance of the educational institution.

129.    Some programs, such as the Guaranteed Student Lan ("GSL") program and the Family Federal Education Loan program ("FFELP"), students and schools jointly submit requests for loans to private lenders which are guaranteed by state guaranty agencies that are, in turn, insured by the Department of Education, which pays only in the event of a student default.

130.    Enforcement actions, including suspension of Title IV payments, are contemplated by the Higher Education Act.  The Department of Education has an enforcement unit which is responsible for taking enforcement action against parties participating in Title IV programs.[20]

131.    The Department of Education has the authority to impose a variety of sanctions and corrective actions on an institution that violates Title IV program rules, a PPA, or any other agreement made under the laws or regulations, or if it substantially misrepresents the nature of its educational programs, financial charges, or graduates' employability.[21]

132.    The Department of Education may impose several types of sanctions on institutions for statutory and regulatory violations, including fines, limitations, and suspensions. 20 U.S.C. §1094(c)(3)(B).

## *The Federal False Claims Act*

133.    The FCA as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), imposes liability on any person who knowingly presents or causes to present a false or fraudulent claim for payment or approval or who knowingly makes or uses or causes to be used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729 (a)(1).

---

[20] https://www.ed.gov/news/press-releases/student-aid-enforcement-unit-formed-protect-students-borrowers-taxpayers
[21] See "Institutional; Eligibility for Participation in Title IV Student Financial Aid Programs, Congressional Research Service, February 14, 2019. https://fas.org/sgp/crs/misc/R43159.pdf

134.   In pertinent part, the FCA states that a person is liable to the United States government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A)(2009).

135.   The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Federal Government's behalf or to advance a Federal Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded...." 31 U.S.C. § 3729(b)(2)(A)(2009).

136.   In order to establish a prima facie FCA violation under section 3729(a)(1), a relator must prove that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." U.S. ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir.2004).

137.   A legally false claim falsely certifies that the claimant has complied with a statute or regulation the compliance with which is a condition for payment from the government. Wilkins v. United Health Group, 659 F.3d 295, 305 (3d Cir. 2011).

138. When a claim of legal falsity is based on a certification of compliance with a legal provision, such certification may be express or implied. <u>Wilkins</u>, 659 F.3d at 306.

139. "Under the express false certification theory, a claimant is liable under the FCA for falsely certifying that it is in compliance with a material statute, regulation, or contractual provision." <u>Wilkins</u>, 659 F.3d at 306 (quoting <u>U.S. ex. rel. Whatley v. Eastwick Coll.</u>, 657 Fed. App'x 89, 94 (3d Cir. 2016)).

140. An implied false certification theory of liability is premised "[o]n the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." <u>Wilkins</u>, 659 F.3d at 305 (quoting <u>Mikes v. Straus</u>, 274 F.3d 687, 699 (2d Cir. 2001)).

141. When a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. <u>Universal Health Servs. v. U.S. ex rel. Escobar</u>, 136 S. Ct. 1989, 1996 (2016).

142. Under the "implied false certification" theory, when that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, "[t]he defendant has made a misrepresentation that renders the claim "false or fraudulent" under § 3729(a)(1)(A). <u>Escobar</u>, 136 S. Ct. at 1996.

**COUNT I – FALSIFICATION OF ATTENDANCE RECORDS**

143. All of the preceding paragraphs are incorporated by reference as if fully set forth herein.

144. In exchange for tuition paid for with Title IV funds, Defendants agreed to provide educational services for students to learn the trade of barbering, among other professions in the field of cosmetology.

145. Defendants entered into written PPAs with the Department of Education and received Title IV funds.

146.   When executing the PPAs with the Department of Education, Defendants certified that they would comply with the implementing regulations for institutional eligibility under Title IV, which includes 34 C.F.R. § 668.22(b).

147.   Defendants understood that they were required to take student attendance because the New Jersey State Board of Cosmetology and Hairstyling required them to do so, pursuant to N.J.A.C. § 13:28-6.15; a school shall keep a "detailed record of students' attendance at classes and subjects taught at these classes." N.J.A.C. § 13:28-6.15(b).

148.   Defendants understood that they were obligated under 34 C.F.R. § 668.22(b)(3)(i)(A) and New Jersey regulations set forth by the New Jersey State Board of Cosmetology and Hairstyling to track its students' attendance, and thus their continued eligibility to receive Federal student aid.

149.   Through the PPAs it submitted to the Department of Education, Defendants intentionally misrepresented their eligibility for payment of Title IV funds.

150.   Defendants falsely certified that they complied with the material regulations within the PPA for which Title IV payments were conditioned upon.

151.   Under Title IV, student attendance records are "[n]ecessary to ensure the proper and efficient administration of funds." 20 U.S.C. § 1094(a)(3).

152.   Defendants manipulated certain students' attendance records in order to maintain students' eligibility for Title IV funds.

153.   Defendants falsified certain students' attendance records by marking certain students as being "present" when those students were in fact "absent" from class.

154.   Defendants falsified students' attendance records by failing to accurately record students' known absences.

155. By falsifying attendance records, Defendants failed to ensure the proper administration of Title IV funds.

156. Defendant Jolie Health and Beauty Academy did not follow its own attendance policy on student lateness nor did it follow the attendance regulations set forth in N.J.A.C. § 13:28-6.21(g).

157. Attendance is required by the State of New Jersey and is required to determine whether students have completed the required 900-hours barbering coursework. In order to apply for licensure as a barber in the State of New Jersey, applicants must have completed 900 hours of instruction. N.J.A.C. 13:28-1.1(e)(1)(iii).

158. The following students, as set forth in attendance sheet attached as **Exhibit G** dated 8/1/2015, had attendance rates below 70%:

   a. S.B. – 67.31 % attendance rate

   b. B.C. – 66.18% attendance rate

   c. G.C. – 68.18% attendance rate

   d. W.D. – 52.20% attendance rate

   e. R.E. – 52.46% attendance rate

   f. M.G. – 59.96% attendance rate

   g. J.M. – 58.45% attendance rate

   h. K.O. – 58.93% attendance rate

   i. J.P. – 64.46% attendance rate

   j. M.R. – 54.26% attendance rate

   k. A.S. – 69.60% attendance rate

   l. S.S. – 55.40% attendance rate

   m. M.T. –65.92% attendance rate

      n.  R.V.  – 56.06% attendance rate

159.    The following students, as set forth in attendance sheet attached as **Exhibit G** dated

9/3/2015, had attendance rates below 70%:

      a.  A.D. – 28.57% attendance rate

      b.  B.G. – 47.62% attendance rate

      c.  C.G. – 47.86% attendance rate

      d.  M.J. – 58.34% attendance rate

      e.  L.S. – 67.86% attendance rate

160.    Numerous students were absent for 10 to 14 consecutive school days, yet nonetheless

they remained on the attendance logs as active students.

161.    Some students did not attend class for periods of 3 to 4 weeks, yet nonetheless remained

on the attendance logs as active students.

162.    Relator notified Defendants that the following students needed to be placed on

probation due to their persistent attendance problems:

      a.  M.J.

      b.  W.J.

      c.  R.V.

      d.  R.M.

163.    In order to continue their receipt of Title IV funds, Defendants failed to place any of

the aforementioned students on academic probation because of their attendance issues.

164.    Defendants were aware of the attendance issues that existed at Jolie Health and Beauty

Academy. (Please see attached **<u>Exhibits B and C</u>**)

165.    Attendance of classroom instruction is required for students to obtain the education that

is paid for by Title IV funds.

166.   Students who were absent and did not attend class could not have benefitted from the classroom instruction that was being provided in their absence at Defendants' school.

167.   Title IV funds are used to pay for students' education; if students are not attending educational classes paid for by Title IV funds, the students are not receiving the educational benefit that Title IV was intended to provide.

168.   Students' actual attendance at an educational institution is material to the Federal Government's decision to pay for those educational services.

169.   The students' receipt of an education and the institution's delivery of an education is the premise behind Title IV payments; attendance is a material component of the reason for issuing Title IV payments in the first place.

170.   In order to continue receiving Title IV funds, Defendants recertified their compliance with the PPAs and failed to disclose their non-compliance with the material regulatory requirements which were contained within the PPAs.

171.   Defendants submitted legally false claims because the PPAs that they executed with the Department of Education omitted their violations pertaining to students' attendance for the barbering program.

172.   Had it known about the attendance issues at Jolie Health and Beauty Academy, upon information and belief, the Department of Education would have suspended Defendants' receipt of Title IV funds.

173.   By knowingly omitting their violations for tracking students' required attendance and falsifying student attendance for the barbering program, Defendants' submission of PPAs to the Federal Government violated the FCA.

174. Defendants' high cohort default rate for Title IV loans shows that the Federal Government has sustained damages; Defendants' students defaulted on their Title IV loans at a rate that was 300% higher than the national default rate in 2016.

175. The Federal Government has suffered damages as a direct result of Defendants' knowing and intentional violations of the FCA.

**WHEREFORE**, Relator demands and prays that judgment be entered in its favor against all Defendants under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as this Court deems to be just and proper.

## COUNT II – FALSIFICATION OF SATISFACTORY ACADEMIC PROGRESS

176. Paragraphs 1 through 142 are incorporated by reference as if fully set forth herein.

177. In exchange for tuition paid for with Title IV funds, Defendants agreed to provide educational services for students to learn the trade of barbering, among other professions in the field of cosmetology.

178. Defendants entered into written PPAs with the Department of Education and received Title IV funds.

179. When Defendants entered into PPAs with the Department of Education, Defendants agreed and understood that they would comply with all statutory provisions applicable to Title IV and all applicable regulatory provisions prescribed under that statutory authority.

180. Defendants understood that, as a condition of their receipt of Title IV funds, they were required to establish a reasonable satisfactory academic progress policy for determining whether eligible students are making satisfactory academic progress.

181.   Defendants understood that in order to receive Title IV funds, a student must meet the institution's published standards of satisfactory academic progress, pursuant to 34 C.F.R. § 668.32.

182.   Upon executing the PPAs, Defendants certified that they would comply with reasonable satisfactory academic progress policy for determining whether eligible students are making satisfactory academic progress.

183.   Defendants failed to follow a reasonable satisfactory academic progress policy.

184.   Defendants inflated the grades of certain students who were not achieving satisfactory academic progress requirements.

185.   Defendants' intentional and purpose-based inflation of grades failed to comply with a reasonable academic progress policy.

186.   Defendants' intentional and purpose-based inflation of grades failed to comply with Defendant Jolie Health and Beauty Academy's published standards for satisfactory academic progress for the sole purpose of fraudulently securing Title IV funds.

187.   Defendants permitted students who could not maintain satisfactory academic progress to remain enrolled at Defendant Jolie Health and Beauty Academy.

188.   Defendants' grade-inflation scheme resulted in a false certification that certain students were maintaining satisfactory academic progress.

189.   The following students failed tests and examinations in the barbering program but were nonetheless given passing scores by Defendants: (Please see attached **Exhibit H**)

   a.   R.V.

   b.   S.F.

   c.   U.M.

   d.   D.S.

    e.  J.P.

    f.  M.T.

    g.  K.C.

    h.  M.J.

    i.  W.J.

    j.  R.V.

    k.  J.A.

    l.  S.F.

    m.  R.M.

190.    The aforementioned students had their grades changed by Defendants from "failing" to "passing."

191.    Because Defendants falsified students' grades, they were not applying the reasonable standards that are required under Title IV regulations.

192.    Defendants falsely represented students' eligibility to receive Title IV funds by falsifying students' grades and falsifying satisfactory academic progress, in violation of 34 C.F.R. § 668.34.

193.    Defendants' certifications on their PPAs that were submitted to the Department of Education omitted their violations of Title IV regulations which governed satisfactory academic progress at the barbering program.

194.    Defendants' certifications on their PPAs that were submitted to the Department of Education omitted their failure to comply with Title IV regulations for utilizing reasonable standards in determining students' satisfactory academic progress at the barbering program.

195.   By certifying that it complied with applying reasonable standards for determining students' satisfactory academic progress, Defendants' representations on its PPAs influenced the Federal Governments' decision to make payments of Title IV funds.

196.   Defendants' certification of their compliance with utilizing reasonable standards in determining students' satisfactory academic progress and certification of their compliance with satisfactory academic progress regulations was material to the Federal Government's decision issue Title IV funds.

197.   The Department of Education has the authority to impose a variety of sanctions against an institution that violates the terms of its PPA.  Had the Federal Government known about Defendants' material omissions regarding students' satisfactory academic progress at Defendant Jolie Health and Beauty Academy, it is reasonable to believe that the Department of Education would have suspended Defendants' receipt of Title IV funds.

198.   By knowingly omitting their violations for failing to implement reasonable standards for satisfactory academic progress and falsifying student grades for the barbering program, Defendants' submission of PPAs to the Federal Government constituted legally false claims, in violation of the FCA.

199.   Defendants' high cohort default rate for Title IV loans shows that the Federal Government has sustained damages; Defendants' students defaulted on their Title IV loans at a rate that was 300% higher than the national default rate in 2016.

200.   The Federal Government has suffered damages as a direct result of Defendants' knowing and intentional violations of the FCA.

**WHEREFORE**, Relator demands and prays that judgment be entered in its favor against all Defendants under the FCA, for the amount of the United States' damages, trebled as required by

law, and such civil penalties as are required by law, together with all such further relief as this Court deems to be just and proper.

## COUNT III – FALSIFICATION OF STUDENT ELIGIBILITY

201. Paragraphs 1 through 142 are incorporated by reference as if fully set forth herein.

202. Defendants were required to submit documentation to the New Jersey Board of Cosmetology certifying that they evaluated each prospective non-English speaking student and determined that each student was proficient in reading and writing the language in which the examination will be administered to that student." N.J.A.C. § 13:28-6.9(a).

203. Defendant Jolie Health and Beauty Academy only administered examinations in the English language for the barbering program.

204. Therefore, as part of its admissions requirements and its accreditation requirements, and as set forth in its PPA, Defendants certified that its' students were able to speak, read and write fluently in English, and that those students were competent enough to succeed in the barbering program.

205. Relator taught her class only in the English language.

206. Relator's examinations were only given in the English language.

207. Relator reasonably believed that many of her students were not proficient in reading and writing in the English language.

208. The following students taught by Relator were not fluent in the English language:

   a. U.M.

   b. D.S.

   c. J.P.

   d. M.T.

e. K.C.

209. In addition to not being fluent in English, Student J.P. was frequently absent from class, and had an attendance rate of 64.46%

210. Another example of an ineligible student is Student J.A. Defendants enrolled and permitted to remain enrolled Student J.A.

   a. Student J.A. was legally blind.

   b. Student J.A. was unable to safely handle the sharp instruments used in the barbering profession; safe handling of sharp instruments, such as scissors, are an essential function of the barbering trade.

   c. Relator did not award Student J.A. passing grades because he failed to demonstrate proficiency with the practical examination component of his coursework. (Classroom work and practical exams were performed using manakins.)

   d. Relator complained to Defendants that Student J.A. was not eligible for the barbering program because he was not able to safely use sharp barbering tools such as scissors.

   e. Defendants nevertheless allowed Student J.A. to remain enrolled in the barbering program.

   f. Defendants received Title IV funds for Student J.A.'s enrollment in their school.

211. Defendants also permitted students who could not maintain satisfactory academic progress to remain enrolled at Defendant Jolie Beauty Academy.

212. Defendants permitted students who failed to attend required classroom instruction to remain enrolled at Defendant Jolie Health and Beauty Academy.

213.   Defendants permitted ineligible students to remain enrolled at Defendant Jolie Beauty Academy, which resulted in Defendants' receipt of Title IV funds.

214.   After knowing that certain students were ineligible based on their failure to maintain satisfactory academic progress, failure to attend classes, Defendants continued to submit applications for Title IV funds on behalf of those ineligible students.

215.   Defendants intentionally misrepresented their eligibility for receipt of Title IV funds and omitted their violations of certifications contained within the PPA which were material to the Federal Government's decision to issue Title IV funds.

216.   By certifying that ineligible students were eligible, Defendants' representations and omissions influenced the Federal Governments' decision to make payments of Title IV funds.

217.   The Department of Education has the authority to impose a variety of sanctions against an institution that violates the terms of its PPA.

218.   Had the Federal Government known about Defendants' initial enrollment of ineligible students at Defendant Jolie Health and Beauty Academy, upon information and belief, the Department of Education would have suspended Defendants' receipt of Title IV funds.

219.   Had the Federal Government known that Defendants continued enrollment of ineligible students at Defendant Jolie Health and Beauty Academy, upon information and belief, the Department of Education would have suspended Defendants' receipt of Title IV funds.

220.   By knowingly omitting their violations pertaining to the enrollment of ineligible students and maintaining ineligible students enrolled in the barbering program,

Defendants' submission of PPAs to the Federal Government constituted legally false claims.

221.   Defendants' high cohort default rate for Title IV loans shows that the Federal Government has sustained damages; Defendants' students defaulted on their Title IV loans at a rate that was 300% higher than the national default rate in 2016.

222.   The Federal Government has suffered damages as a direct result of Defendants' knowing and intentional violations of the FCA.

**WHEREFORE**, Relator demands and prays that judgment be entered in its favor against all Defendants under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as this Court deems to be just and proper.

## COUNT IV - RETALIATORY DISCHARGE

223.   Paragraphs 1 through 142 are incorporated by reference as fully set forth herein.

224.   The FCA provides relief from retaliatory actions.

225.   Under 31 U.S.C. § 3730(h)(1), "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." Id.

226.   The relief under 31 U.S.C. § 3730(h)(1) "[s]hall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and

compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." Id.

227.   A plaintiff need not have developed "a winning qui tam action" to receive protection under the false claims act. Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 187 (3d Cir. 2001).

228.   An employee shall be entitled to all relief necessary to make that employee, whole, if that employee is "[d]ischarged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee" in efforts to stop one or more violations of the false claims act. 31 U.S.C. § 3730(h)(1).

229.   A causal link between protected activity and adverse action may be inferred from "an unusually suggestive temporal proximity between the [two]." Lauren W. ex rel. Jean W.  v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

230.    In order to establish a claim under § 3730(h), a relator must show "(1) she engaged in protected conduct, (i.e., acts done in furtherance of an action under § 3730) and (2) that [she] was discriminated against because of [her]protected conduct." U.S. ex. rel. Hefner v. Hackensack Univ. Med. Ctr., 495 F.3d 103, 110 (3d Cir. 2007) citing Hutchins, 253 F.3d at 186.

231.   For a relator to demonstrate that she was retaliated against "'because of' conduct in furtherance of a FCA suit, a relator must show that (1) her employer had knowledge she was engaged in 'protected conduct'; and (2) that her employer's "[r]etaliation was motivated, at least in part, by the employee's engaging in 'protected conduct.'" U.S. ex. rel. Hefner v. Hackensack Univ. Med. Ctr., 495 F.3d 103, 111 (3d Cir. 2007).

232.    Determining whether conduct constitutes "protected conduct" is a fact-specific inquiry that is to be construed broadly. <u>Hutchins</u>, 253 F.3d at 187.

233.    Protected activities can include internal reporting of an employer's false or fraudulent claims. <u>Hutchins</u>, 253 F.3d at 187, citing <u>U.S. ex rel. Yesudian v. Howard Univ.</u>, 153 F.3d 731, 739 (D.C. Cir. 1998).

234.    Relator made complaints which pertained to Defendants' receipt of Title IV funds and Defendants failure to comply with Title IV regulations.

235.    Relator engaged in protected activity by complaining about students' failure to attend classes, lack of satisfactory academic progress, and about ineligible students remaining enrolled in the barbering program.

236.    Towards the end of July 2015, Relator complained about violations of Title IV regulations to Jim O'Brien, a Director at Defendant Jolie Health and Beauty Academy; Mr. O'Brien began his employment with Defendant in the beginning of July 2015.

237.    Relator complained to Mr. O'Brien that multiple students who were enrolled were not able to read or write in English, and that many were not fluent in English.

238.    Relator complained to Mr. O'Brien that many students did not have the proper attendance to remain enrolled in the program, yet those students remained enrolled at Defendant Jolie Health and Beauty Academy regardless.

239.    Relator communicated to Mr. O'Brien about multiple students being given passing grades despite the fact that those students failed the class that Relator taught.

240.    In September of 2015, Relator told Kristen Herbst that she may be getting a lawyer to look into the illegal activity at the school.

241.    Defendants were aware of Relator's complaints about students' failure to attend classes and lack of satisfactory academic progress, while being permitted to remain enrolled at Defendant Jolie Health and Beauty Academy.

242.    Defendants were aware of Relator's complaints about ineligible students remaining enrolled in the barbering program.

243.    Defendants' representations pertaining to students' attendance, satisfactory academic progress, and eligibility were embodied within the PPAs that Defendants submitted to the Department of Education.

244.    Relator's complaints to Defendants encompassed multiple Title IV regulations - students' attendance, satisfactory academic progress, and eligibility.

245.    Relator's protected complaints placed Defendants on notice of their violations of Title IV regulations; Defendants should have been aware of the distinct possibility of a claim under the FCA.

246.    Within three months of Relator's complaints to Mr. O'Brien (who began employment with Defendants in July 2015) pertaining to student attendance, failure to achieve and maintain satisfactory academic progress, and maintaining enrollment of ineligible students, Relator's employment was terminated.

247.    Defendants' termination of Relator's employment was in violation of 31 U.S.C. § 3730(h) because the termination was causally connected to Relator's complaints about students' attendance, lack of satisfactory academic progress, and ineligible students remaining enrolled at Defendant Jolie Health and Beauty Academy.

248.    Relator has suffered economic and emotional damages as a consequence of Defendants' wrongful termination of her employment based on her protected complaints.

**WHEREFORE,** Relator seeks back-pay, from the date of wrongful termination; front-pay; additional damages in the amount of two times the amount of back-pay per 31 U.S.C. § 3730(h)(2); litigation costs, expenses, special damages, and attorney's fees to the fullest extent permitted under the law; and, such other and further relief as this Court deems just and proper.

Respectfully submitted,

Date: <u>September 15, 2020</u>

<u>s/Franklin J. Rooks, Jr</u>
Franklin J. Rooks, Jr., Esquire
Jared A. Jacobson, Esquire

*Attorneys for Relator*